CLEVELAND BAR ASSOCIATION v. COMPMANAGEMENT, INC., ET AL.

[Cite as *Cleveland Bar Assn. v. CompManagement, Inc.*, 104 Ohio St.3d 168, 2004-Ohio-6506.]

(No. 2004–0817—Submitted August 17, 2004—Decided December 15, 2004.)

ALICE ROBIE RESNICK, J.

{¶ 1} On April 15, 2002, relator, Cleveland Bar Association ("CBA"), filed a complaint with the Board of Commissioners on the Unauthorized Practice of Law pursuant to Gov.Bar R. VII(5). The complaint alleged that respondents Comp-Management, Inc. ("CMI"), Jonathan R. Wagner, Robert J. Bossart, and Bobbijo Christensen engaged in the unauthorized practice of law as follows:

{¶ 2} (1) "[B]y appearing in person at formal, oral, adjudicatory hearings, scheduled and held by the Industrial Commission of Ohio, upon various disputed workers' compensation matters, in behalf of so-called 'clients' of respondent CompManagement, Inc., and, in the course of such appearances, performing such acts as examining and/or cross-examining witnesses; interpreting statutory provisions, case law, and administrative rulings; and making and/or giving legal interpretations with respect to the nature, weight, significance, and credibility of the evidence presented at such hearings and/or theretofore already of record in the Industrial Commission of Ohio's claim file upon the claim then in issue"; and

{¶ 3} (2) By preparing, signing, and filing "various documents of a legal nature, such as notices of appeal, motions, objections to orders of the Administrator of Workers' Compensation, applications for handicap reimbursement, applications for the settlement of individual workers' compensation claims, and requests for continuances, in behalf of respondent CompManagement, Inc.'s so-called 'clients.' "[1]

---

1. In its complaint, CBA also alleged that attorney Tim Toth had assisted the respondents in engaging in the unauthorized practice of law. Although attorney Toth was initially named as a respondent in these proceedings, the board has dismissed the claims against him for lack of jurisdiction, and no objections have been filed to this aspect of the board's report.

{¶ 4} After extensive discovery by the parties, the board held a formal evidentiary hearing pursuant to Gov.Bar R. VII(7)(A) and (14), which was conducted on May 21 and 22, 2003, and adjourned to and completed on August 22, 2003. The board filed its final report on May 18, 2004, recommending that this court issue an order finding that respondents CMI and Bobbijo Christensen have engaged in the unauthorized practice of law, prohibiting them from engaging in the unauthorized practice of law in the future, and providing for reimbursement of costs and expenses incurred by the board and relator.

{¶ 5} In making its recommendation, the board concluded that the following conduct in which CMI and/or Christensen engaged amounts to the unauthorized practice of law: (1) "preparation, signing and filing of documents in handling claims before the Industrial Commission on behalf of employers," (2) "negotiation and involvement with settling claims," (3) "direct and indirect examination [including cross-examination] of witnesses during hearings," (4) "presentation of employer concerns, arguments, summations of evidence, conclusions regarding the import of factual information and/or closing statements on behalf of employers during hearings," (5) "recommendation and advice to employers as to taking appeals and other legal action," and (6) "evaluation, advice or recommendation concerning whether an employer should retain an attorney to handle a claim before the Industrial Commission."

{¶ 6} The board also found that CMI engaged in the unauthorized practice of law generally by its "representation of employers' interests in handling claims before the Industrial Commission," and that it furnished information to its hearing representatives with regard to "[p]ertinent court decisions and changes in the workers' compensation law * * *, sometimes using a law firm to summarize the legal developments for [its] employees."

{¶ 7} Despite the breadth of its evidentiary review, the board's legal analysis was admittedly less than comprehensive. The board found itself unequipped "to evaluate * * * public interest factors or exercise discretion in applying Rule VII," since it serves only "as an advisory body under the Supreme Court and * * * merely offers recommendations." Accordingly, the board declined to consider that the public interest might warrant restraint in the use of the court's power to suppress lay representation in the workers' compensation field. Instead, the board took the approach that respondents are not authorized to engage in any conduct that corresponds to an activity that has been listed in some generalized definition of the practice of law under "the applicable precedents," while leaving it to this court to "factor[ ] in public interest considerations and a measure of flexibility" in determining whether "lay representation [would] pose a hazard to the public in this limited setting."

{¶ 8} After the filing of the final report of the board, we issued an order to respondents to show cause why the report should not be confirmed and an appropriate order granted. Gov.Bar R. VII(19)(A). Both respondents and relator have filed objections to the report.

{¶ 9} The cause is now before the court for the determination specified in Gov.Bar R. VII(19)(D).

{¶ 10} The immediate issue in this unauthorized-practice-of-law case centers on the activities of a single, although perhaps Ohio's largest, actuarial service company and its employees in connection with their representation of employers in matters of workers' compensation. The potential impact of its resolution, however, extends far beyond this proceeding, for it implicates the Industrial Commission's longstanding policy of permitting nonlawyers, specifically actuarial firms and unions, to appear and practice before the commission and the Bureau of Workers' Compensation in a representative capacity on behalf of employers and injured workers and to perform a variety of functions as regards the administration and adjudication of workers' compensation claims.

{¶ 11} The workers' compensation system in Ohio began with "the unanimous adoption of Proposal Number 24, or Section 35, Article II [of the Ohio Constitution], at the Constitutional Convention of 1912 and the enactment of Ohio's first compulsory workers' compensation law, 103 Ohio Laws 72, on February 26, 1913." *Holeton v. Crouse Cartage Co.* (2001), 92 Ohio St.3d 115, 118, 748 N.E.2d 1111. The system was conceived and has long since functioned as an alternative loss-distribution mechanism to that of the common law of torts, which had proved wholly unsound and "incapable of dealing with the often devastating social and economic consequences of industrial accidents." Id. at 119, 748 N.E.2d 1111.

{¶ 12} The joint committee that sponsored the 1924 constitutional amendment that put Section 35, Article II in its present form intended for the system to operate " 'without necessity for recourse to law suits or employment of attorneys or payment of court costs.' " *Mabley & Carew Co. v. Lee* (1934), 129 Ohio St. 69, 74–75, 1 O.O. 366, 193 N.E. 745. Thus, "[o]ne of the main objects sought to be accomplished by [the] enactment [of the Workers' Compensation Act] was to provide a speedy, simple, and inexpensive method to compensate" workers for work-related injuries "and to do away with the vexatious and protracted litigation which had proved so costly, exhaustive, and unsatisfactory, oftimes resulting in great injustice." *Goodman v. Beall* (1936), 130 Ohio St. 427, 429, 5 O.O. 52, 200 N.E. 470.

{¶ 13} Accordingly, lay representation has been a feature of Ohio's workers' compensation system since its inception. Id. at 430, 5 O.O. 52, 200 N.E. 470. While the adjective complexities of today's workers' compensation statutes "bear[ ] little resemblance to the rather simple plan first prescribed," *McMillen*

*v. McCahan* (C.P.1960), 83 Ohio Law Abs. 1, 14 O.O.2d 221, 167 N.E.2d 541, 549, the sophistication and presence of nonlawyer representatives in the system have steadily increased. Thus, in 1963, it was estimated that 20,000 claims were set for an initial-level hearing before the Industrial Commission each year, that a representative appears on behalf of at least one of the parties in 60–65 percent of the hearings, and that "nonlawyers represent claimants in 60 per cent of the cases and employers in more than 50 per cent of the cases" in which a hearing representative is involved. *In re Unauthorized Practice of Law in Cuyahoga Cty.* (1963), 175 Ohio St. 149, 156–157, 23 O.O.2d 445, 192 N.E.2d 54 (Gibson, J., concurring in part and dissenting in part).

{¶ 14} By 1970, actuarial firms in particular had become the primary means by which many Ohio employers discharge their obligations under the Workers' Compensation Act. Consequently, on December 31, 1970, the Unauthorized Practice of Law Committee of the Ohio State Bar Association ("OSBA") and 13 actuarial service companies adopted a set of "Standards of Practice Governing Actuarial Services," which is often tersely referred to as the "1970 agreement." See XLIV Ohio Bar 161 (Feb. 8, 1971). Cf. *State ex rel. Nicodemus v. Indus. Comm.* (1983), 5 Ohio St.3d 58, 62–63, 5 OBR 115, 448 N.E.2d 1360 (Holmes, J., dissenting).

{¶ 15} The 1970 agreement enumerates various functions that actuarial firms may and may not properly perform and recommends "to others concerned" that they follow these "principles as standards of proper conduct for actuarial service companies." XLIV Ohio Bar at 162. In so doing, the agreement purports to strike an appropriate balance between "the public interest [in] the prompt, fair and efficient administration of the Workmen's Compensation Laws" and the "recognition that no person may practice law in Ohio, who has not been admitted to the Bar by the Supreme Court of Ohio." Id. at 162, 163.

{¶ 16} By its own terms, the 1970 agreement is not directly enforceable against anyone. Id. at 164. (Determinations of joint actuarial service commission created under agreement "shall not be binding upon any signatory to these standards.") Its list of permissible and prohibited actuarial functions, however, has since been the cornerstone of the Industrial Commission's policy on nonlawyer appearance and practice before the agency. As explained in a recent "Statement of All Members of the Industrial Commission," dated May 21, 2004, "For more than 30 years, this and past Industrial Commissions have followed the 1970 Agreement * * *. Relevant portions of the agreement were set forth initially in Hearing Officer Manual at T.6. This policy statement has been in place since January 1, 1989 and was republished in 2001 as Hearing Officer Manual R4."

{¶ 17} In their May 21, 2004 statement, the commissioners also revealed that "[i]n the past two days, approximately 70% of Industrial Commission hearings have been continued due to concerns raised following [the board's] recommendations [in this case]" and that "injured workers and their employers have experienced hardships due to the continuation of hearings." Accordingly, the Industrial Commission rescinded Hearing Officer Manual Memo R4 on June 2, 2004, and replaced it with Resolution No. R04–1–01. Some of the stated purposes of the resolution are to update the standards set forth in the 1970 agreement in order to reflect "changes in the workers' compensation system that have developed over the last 33 years," to resolve questions concerning "those specific guidelines that are in the 1970 agreement * * * but are not expressly set forth in Memo R4," and "to issue interim standards for third party administrators [i.e., actuarial firms], union representatives, or employees of employers who appear before the Bureau and Commission until permanent guidelines are issued by the Ohio Supreme Court in the case of *Cleveland Bar Association v. CompManagement*, Case No. 04–0817."

{¶ 18} Industrial Commission Resolution No. R04–1–01 provides:

{¶ 19} "(A) The following activities shall be permitted before the Industrial Commission or the Bureau of Workers' Compensation, to the extent performed by third-party administrators, by union representatives until permanent guidelines are provided by the Ohio Supreme Court, or employees of an employer:

{¶ 20} "1. Investigation, or assistance to injured workers and employers in investigating, the facts with respect to any claim, including discussing the facts and their relationship to the claim with employers, witnesses, and others, preparing and securing statements, and preparing and obtaining reports regarding the facts;

{¶ 21} "2. Assistance to injured workers and employers in the administration of a claim and the filing of claims and appeals, without making any legal determination respecting such claims or appeals, before the administrator of the Bureau of Workers' Compensation and/or the Industrial Commission of Ohio;

{¶ 22} "3. Attendance at any hearing before the Industrial Commission for the purposes of recording and reporting any action taken at such hearing, reporting the factual results of any claim investigation, apprising the hearing officer or officers of documents or parts thereof that are in the file or that are missing from the file, including medical reports, filing documents, requesting a postponement or continuance of the hearing, and discussing matters within the independent knowledge of the representative, subject to all the limitations as set forth below;

{¶ 23} "4. Completion and submission of any and all records and reports with the Bureau of Workers' Compensation or the Industrial Commission of Ohio regarding injured workers and employers, including, but not limited to, any and

all forms promulgated and adopted by the Industrial Commission and the Bureau of Workers' Compensation, either written, verbal or electronically produced;

{¶ 24} "5. Completion and submission of records and reports dealing with job classifications pertinent to premium rates and other Bureau of Workers' Compensation premium programs;

{¶ 25} "6. Completion and submission of any and all reports or forms concerning, but not limited to, premiums, payroll rate adjustment protests, settlements, and handicap reimbursement requests before the Bureau of Workers' Compensation or the Industrial Commission;

{¶ 26} "7. Filing protests within the Bureau of Workers' Compensation to the Adjudicating Committee, the Self–Insured Review Panel, the Self–Insuring Employers Evaluation Board, or the Administrator, or his designee, as permitted by statute, and representation before any of these bodies, subject to the limitations set forth below;

{¶ 27} "8. Preparation of reports to employers dealing with the status of risks, status of reserves and actuarial analysis thereof;

{¶ 28} "9. Advise employers or injured workers to seek legal representation.

{¶ 29} "(B) In recognition that no person may practice law in Ohio who has not been admitted to the Bar by the Supreme Court of Ohio, and further recognizing that the practice of law is defined by the Ohio Supreme Court, non-lawyers may not properly perform the following functions before the Industrial Commission or the Bureau of Workers' Compensation:

{¶ 30} "1. Examine or cross-examine the claimant or any witness, directly or indirectly;

{¶ 31} "2. Cite, file or interpret statutory or administrative provisions, administrative rulings or case law;

{¶ 32} "3. Make and give legal interpretations with respect to testimony, affidavits, medical evidence in the form of reports or testimony, or file any brief, memorandum, reconsideration or other pleading beyond the forms actually provided by the Commission or the Bureau;

{¶ 33} "4. Comment upon or give opinions with respect to the evidence, credibility of witnesses, the nature and weight of the evidence, or the legal significance of the contents of the claims file;

{¶ 34} "5. Provide legal advice to injured workers and employers;

{¶ 35} "6. Give or render legal opinions, or cite case law or statutes to injured workers and employers before, at or after the time when claims are initially certified or denied certification as valid claims by the employer upon the presentation of claim applications by employees;

{¶ 36} "7. Provide stand-alone representation at hearing by charging a fee specifically associated with such hearing representation without providing other services."

{¶ 37} Nonlawyer representatives are today more than ever an integral part of Ohio's workers' compensation system. As of June 2002, there were 2,224,466 open workers' compensation claims in Ohio. Between 1997 and 2002, the Industrial Commission held an average of 179,786 hearings each year. During 2002, a total of 236,344 new claims were filed, and 189,869 claims were heard. According to the bureau, "[a]s of March 30, 2003, there were 12,546 active claims with a representative having a code of 'LREP UNION IW' which is usually used for a union representative." According to CMI's expert, Daniel Ingberman, "[o]f the 263,638 workers' compensation insurance policies in Ohio in 2002, 99,224 (37.6%) use the services of an Actuarial Firm for their workers' compensation claims." Employers using the services of CMI in claims with injury dates between January 1998 and December 2001 sought attorney representation at hearings only "1.5% of the time." The state of Ohio estimates that nonlawyers represent at least one party in approximately 95 percent of the hearings held each year and that "in almost half of all Industrial Commission hearings (47 percent or 89,300 total hearings) [held each year], the employer's only representative is an actuary." And considering that within two days after the board's report in this case the Industrial Commission was compelled to continue "approximately 70%" of its hearings due to concerns over nonlawyer representation, it is clear that actuarial firms and unions have come to play a critical role in the workers' compensation system.

{¶ 38} It is no secret that a full confirmation of the board's report in this case would substantially alter the administrative landscape. As the 90 parties and amici interested in this proceeding are well aware, that eventuality would immediately vitiate Industrial Commission procedures that have been in place for more than 30 years, ban virtually all nonlawyer involvement in the hearing process, significantly, if not drastically, curtail the business of actuarial firms, and, to a lesser extent, impair the ability of unions to represent their members, and increase the premium costs and attorney fees for workers' compensation claims in Ohio. From a practical standpoint, the issuance of an order as recommended by the board would purge the workers' compensation system of nonlawyer representatives, for the board has suggested that we enjoin laypersons from engaging in conduct that ranges from the most mundane processing functions, such as preparing administrative documents, to the overall handling of workers' compensation claims.

{¶ 39} This court has exclusive power to regulate, control, and define the practice of law in Ohio and, therefore, the ultimate "authority to determine the

qualifications of persons engaged in the practice of law before the Industrial Commission." *In re Unauthorized Practice of Law in Cuyahoga Cty.,* supra, 175 Ohio St. at 151, 23 O.O.2d 445, 192 N.E.2d 54.  See, also, *Shimko v. Lobe,* 103 Ohio St.3d 59, 2004-Ohio-4202, 813 N.E.2d 669, ¶ 15.  However, while this court unquestionably has the power to prohibit lay representation before an administrative agency, it is not always necessary or desirable for the court to exercise that power to its full extent.  The power to regulate includes the authority to grant as well as the authority to deny, and in certain limited settings, the public interest is better served by authorizing laypersons to engage in conduct that might be viewed as the practice of law.

{¶ 40} Because the "public interest factors" that the board declined to consider are so prevalent in this case, a more sophisticated approach to resolving the present inquiry is required than simply ascertaining whether respondents' conduct falls within some abstract or generalized definition of the practice of law.  Of course, Gov.Bar R. VII is built on the premise that limiting the practice of law to licensed attorneys is generally necessary to protect the public against incompetence, divided loyalties, and other attendant evils that are often associated with unskilled representation.  But not all representation requires the level of training and experience that only attorneys can provide, and in certain situations, the protective interest is outweighed by other important considerations.

{¶ 41} Thus, in a keenly insightful analysis, former Justice Gibson provided the following essential framework for resolving the present inquiry:

{¶ 42} "[W]hat part, if any, of the activities required of one acting in a representative capacity before the Industrial Commission or the Bureau of Workmen's Compensation or both constitute[s] the practice of law for which only attorneys at law are qualified?  The answer to this question involves the resolution of many conflicting interests and considerations.

{¶ 43} "In an attempt to find a mold in which to fit this issue, many cases concerning the unauthorized practice of law by those not licensed as attorneys at law were examined.  Such cases, including those relating specifically to workmen's compensation, are filled frequently with broad and sometimes all-encompassing statements, which might be termed political in nature, as to what constitutes the practice of law, but in the end the courts find that not all is black or white, and laymen usually are permitted to continue performing some acts alleged to constitute the unauthorized practice of law.  Clearly, the answer to the critical question in this case is not to be found in any generalized definition of what constitutes the practice of law.

{¶ 44} "There can be no doubt that here it is necessary to balance (1) the public interest in the greater protection generally afforded the public in matters relating to the law by persons who have pursued required courses of legal training, passed

examinations showing their qualifications in legal matters and who are subject to ethical standards enforced by this court against (2) the public interest, as expressed in constitutional and statutory provisions, in affording workers compensation for injuries or death arising out of and in the course of employment without necessity of litigation, attorneys, and their attendant costs. (Attention is invited to *Goodman v. Beall et al., Industrial Commission* [1936], 130 Ohio St. 427 [5 O.O. 52, 200 N.E. 470], where Zimmerman, J., for this court, discussed the objectives of both Section 35, Article II, Ohio Constitution, and the Workmen's Compensation Act.) These conflicting interests are represented by the committee, which emphasizes the necessity of protecting the public against the hazards of advice and representation of persons unqualified in the law with respect to rights and obligations under the Workmen's Compensation Act, as amended and as construed by numerous court rulings and by the respondents, who emphasize the informality of workmen's compensation proceedings and the desire of the founders of the Ohio workmen's compensation system to enable workers to obtain relief without paying attorney fees or court costs and without vexing litigation." *In re Unauthorized Practice of Law in Cuyahoga Cty.*, supra, 175 Ohio St. at 154–155, 23 O.O.2d 445, 192 N.E.2d 54 (Gibson, J., concurring in part and dissenting in part).

{¶ 45} Confronting a similar issue in *Henize v. Giles* (1986), 22 Ohio St.3d 213, 22 OBR 364, 490 N.E.2d 585, the court decided to authorize lay representation at unemployment compensation hearings even though that activity could be viewed as the practice of law. At issue in *Henize* was an agency rule that authorized nonlawyers to represent claimants and employers at administrative hearings before the Ohio Bureau of Employment Services and the Unemployment Compensation Board of Review. As explained by the court:

{¶ 46} "This rule reflects the board's longstanding policy of permitting nonlawyers to assist parties in the presentation of their claims. The proceedings are designed and function as alternatives to judicial dispute resolution so that the services of a lawyer are not a requisite to receiving a fair hearing and just decision.

{¶ 47} "In this regard, claimants are traditionally accompanied by * * * union representatives * * *. Over the years, an increasing number of employers have utilized [actuarial] service companies to provide management support of various payroll, tax and employee benefit operations. * * * As an incidental portion of such service, agents are provided to attend board hearings as representatives of the employer." Id., 22 Ohio St.3d at 216–217, 22 OBR 364, 490 N.E.2d 585.

{¶ 48} The court recognized that along with its broad regulatory power over the practice of law comes "the concomitant responsibility to protect the public by preventing the unauthorized practice of law, while at the same time not exercising

this authority so rigidly that the public good suffers." Id. at 217, 22 OBR 364, 490 N.E.2d 585. The court explained that it is "the responsibility of the judiciary not to take a one-dimensional approach in the area of regulating the unauthorized practice of law," but instead to exercise its power " 'in a common-sense way in order to protect primarily the interest of the public and not to hamper and burden such interest with impractical technical restraints.' " Id. at 218, 22 OBR 364, 490 N.E.2d 585, quoting *Cowern v. Nelson* (1940), 207 Minn. 642, 647, 290 N.W. 795.

{¶ 49} Thus, after noting that "other states have allowed lay representation at unemployment hearings even though it could arguably be viewed as the practice of law," the court further explained:

{¶ 50} "The following quote from *State v. Dinger* (1961), 14 Wis.2d 193, 109 N.W.2d 685 (which allowed brokers to engage in certain legal practices), is representative of the reasoning of some of our sister states which have allowed lay practice in certain instances and is instructive to the case sub judice:

{¶ 51} " 'Further, although we have the power to declare void Rule, sec. R.E.B. 5.04, insofar as it affects the practice of law, we do not use the power in this instance, because we, ourselves, consider the rule a salutary one which in its essentials continues a practice of laymen which we have long tacitly permitted and which has worked reasonably well. The Rule has not enlarged the practice of the law by laymen which we have hitherto permitted. When we consider that such practices should be discontinued it will be time for us to use our power. It is not required now.' Id. at 206, 109 N.W.2d at 692.

{¶ 52} "The finding is inescapable that because of the character of the proceedings in light of the interest at stake, lay representation does not pose a hazard to the public in this limited setting. Our conclusion is further bolstered by the clear recognition that lay representation has been the practice since the inception of Ohio's unemployment compensation program in 1936.

{¶ 53} "* * * We believe board hearings should not be turned into adversarial proceedings since they are legislatively designed to function as an informal mechanism through which the referee, in a participatory capacity, ascertains the facts involved. In light of the serious detriment to claimants and employers which would result if the current system was unnecessarily disturbed, we deem this to be an appropriate and *limited setting* in which to authorize lay representation by granting due deference to the statute and agency rule." (Emphasis sic; footnote omitted.) Id. at 218–220, 22 OBR 364, 490 N.E.2d 585.

{¶ 54} Nevertheless, lay representatives were not given carte blanche in *Henize* to appear and practice before the unemployment compensation agencies. Accordingly, the court in *Henize* was careful to point out: "Our decision today does not reach nor permit the rendering of legal advice regarding unemployment

compensation laws or board orders. Rather, our narrow holding merely permits lay representation of parties to assist in the preparation and presentation of their cause in order to facilitate the hearing process." Id., 22 Ohio St.3d at 219, 22 OBR 364, 490 N.E.2d 585. Specifically, the court permitted agents of actuarial firms to attend board hearings as employer representatives in order "to assure that the board has the appropriate personnel records, staff, and other documents present at the hearing and to assist in the fact-finding process during the referee's claim review." Id. at 217, 22 OBR 364, 490 N.E.2d 585.

{¶ 55} In the workers' compensation setting, the court has decided four cases involving lay practices before the Industrial Commission in which it held that certain specific legal activities are properly performed only by attorneys at law. *Cincinnati Bar Assn. v. Estep* (1995), 74 Ohio St.3d 172, 657 N.E.2d 499 (contingent-fee representation of workers' compensation claimant); *In re Unauthorized Practice of Law,* supra (same); *State ex rel. Nicodemus,* supra (advising clients of the legal ramifications of commission orders); *Goodman,* supra (preparation of court record under pre–1955 rehearing proceedings in accordance with former G.C. 1465–90, 111 Ohio Laws 227). Because the activities at issue in these cases were so clearly beyond any acceptable bounds of lay representation, the court was able in certain instances to simply make a general statement about the legal nature of appearances and practice before the Industrial Commission and conclude therefrom that the lay conduct at issue was unauthorized. This approach, however, has tended to create substantial confusion over the legal nature of other lay practices before the commission and the extent to which the practice-of-law label determines the layperson's authority to engage in representative conduct.

{¶ 56} Indeed, this court added to the confusion by actually misreading its own cases in *Henize.* Thus, despite the obvious fact that the unemployment and workers' compensation settings are virtually equivalent in every way that matters for purposes of the present discussion, the court in *Henize* felt compelled to draw a tenuous distinction between the two fields because it mistakenly concluded that our past decisions in the workers' compensation area "have held that representatives of parties must be licensed attorneys." Id., 22 Ohio St.3d at 219, 22 OBR 364, 490 N.E.2d 585, fn. 10. To the same effect, CBA has cited those decisions to support its contention that nonlawyers are precluded from performing the various representative functions mentioned in the board's report that are allowed under Resolution No. R04–1–01. But the plain truth is that this court has never held that only lawyers may practice in a representative capacity before the Industrial Commission. Nor has the court ever concluded that nonlawyers are unauthorized to provide the kind of representative services in the workers' compensation setting that the court in *Henize* authorized them to provide in the unemployment

context. Accordingly, we find that now is the appropriate time to clarify the import of our prior decisions in this area.

{¶ 57} In *In re Unauthorized Practice of Law*, the court upheld an injunction prohibiting certain individuals and a partnership from representing workers' compensation claimants. In so doing, the court held:

{¶ 58} "No person, other than an attorney in good standing, may hold himself out as being qualified to render service to those who may have claims for compensation arising under the Workmen's Compensation Laws of Ohio or as being able to render services in the preparation and presentation of such claims nor may such person render such advice or services if a fee for such advice or services is to be received from or charged against the one having such a claim." Id., 175 Ohio St. 149, 23 O.O.2d 445, 192 N.E.2d 54, paragraph three of the syllabus.

{¶ 59} The awkward syntax of this syllabus makes it facially unclear whether the court was prohibiting lay representatives from providing preparation and presentation services in general or merely for a fee. Thus, CBA argues that under this holding, laypersons are generally precluded from "[a]ppearing at adjudicative hearings as advocates before the Industrial Commission." We find it eminently clear, however, that the court did not intend its holding to apply beyond the particular type of conduct at issue.

{¶ 60} In reaching its holding, the court specifically recognized that there is "a substantial danger that reasons given by this court for its decision in this case may be interpreted as prejudging controversies which may later arise in determining whether other kinds of conduct not in or related to court cases amount to the practice of law. Thus, the briefs filed in this case on behalf of *amici curiae* emphasize how important it is that this court should avoid broad generalizations in giving its reasons for holding that what the respondents did in the instant case amounted to the practice of law." Id., 175 Ohio St. at 152, 23 O.O.2d 445, 192 N.E.2d 54.

{¶ 61} An expansive interpretation of the holding in *In re Unauthorized Practice of Law* would, therefore, be patently illogical, for it necessarily assumes that the court made the very kind of broad generalization that it expressly sought to avoid. In any event, the court specifically explained that its primary concern was in "[p]rotecting members of the public from being induced *to pay* for such advice and services of nonlawyers" and that "the judgment of the trial court enjoins respondents from doing those acts instead of, as it probably should have, merely enjoining them from doing them *for a fee*." (Emphasis added.) Id. at 152–153, 23 O.O.2d 445, 192 N.E.2d 54, citing *Goodman*, supra.

{¶ 62} In *Estep*, supra, the court prohibited the respondent in that case from engaging in essentially the same conduct that was enjoined in *In re Unauthorized*

*Practice of Law*, and its primary focus was also on prohibiting nonlawyers from charging or receiving a fee for rendering advice or services to workers' compensation claimants. Nevertheless, CBA cites *Estep* for the proposition that "[p]reparing, signing, and filing of legal papers—such as objections to orders, notices of appeal, motions, protests and applications—with the Bureau of Workers' Compensation and the Industrial Commission in behalf of others constitutes the practice of law."

{¶ 63} In a general sense, CBA is correct, for the court in *Estep* found that "appearances and practice before the Industrial Commission constitute the practice of law." Id., 74 Ohio St.3d at 173, 657 N.E.2d 499. In so doing, the court cited *State ex rel. Nicodemus*, supra, 5 Ohio St.3d at 60, 5 OBR 115, 448 N.E.2d 1360, which held as follows:

{¶ 64} "Appearances and practice before the Industrial Commission constitute the practice of law. *Goodman* * * *; *In re Unauthorized Practice of Law* [supra]. Gates, McDonald [an actuarial firm] is not authorized to practice law, and, thus, is not authorized to advise its clients of the legal ramifications of commission orders. For this reason, we find that the 'import' of the order was beyond the scope of Gates, McDonald's authority, and that the notice received by it cannot be imputed to the employer."

{¶ 65} But aside from the specific conduct at issue in these cases, the court has held that laypersons are *not* prohibited from appearing and practicing before the commission in a representative capacity. All three of these cases—*Estep, State ex rel. Nicodemus*, and *In re Unauthorized Practice of Law*—ultimately come to rest on the court's decision in *Goodman*. Yet *Goodman* never held that appearances and practice before the Industrial Commission generally constitute the practice of law for which only attorneys are qualified. *Goodman* held only that "the preparation of a rehearing record should be in complete charge of an attorney at law" because "[s]uch record constitutes the entire evidence upon which the merits or demerits of a claim can be determined by a court and jury." Id., 130 Ohio St. at 433, 5 O.O. 52, 200 N.E. 470.

{¶ 66} Other than the preparation of a court record, however, the court in *Goodman* specifically held that lay representatives *are generally authorized* to appear and practice before the Industrial Commission. Thus, the court explained:

{¶ 67} "In the vast majority of instances no special skill is required in the preparation and presentation of claims. Ordinarily they consist of statements and affidavits submitted by the employer, the employee, or the latter's dependents, and by others having knowledge of the facts, accompanied by the reports of attending physicians or surgeons, on forms prepared and furnished by the commission. Frequently the commission has its own representative conduct an

independent investigation of the particular claim for the purpose of ascertaining the true situation, and sometimes there are informal oral hearings before a referee. Validity of the claim having been established, compensation is paid on the basis prescribed by the statutes, and the incident is closed.

{¶ 68} "Since the inception of the Workmen's Compensation Act it has been common practice for laymen to assist an injured or diseased workman or his dependents in the submission of a claim. Often this is done as an accommodation by representatives of the employer or by representatives of an organization to which a claimant may belong, and such usually simple services are for the most part performed in an expeditious and satisfactory manner. In our judgment this is not the practice of law * * *." Id., 130 Ohio St. at 430–431, 5 O.O. 52, 200 N.E. 470.

{¶ 69} It now becomes readily apparent that these four cases do not prohibit lay representation before the Industrial Commission, but instead mark the outer boundaries of permissible lay conduct. It is also clear that the thicket created by our ambivalent use of the term "practice of law" can be avoided by simply recognizing that in certain cases there are multiple interests to consider in determining whether a particular legal activity is acceptably performed by nonlawyers. In this way, we can freely assume that all representative conduct at the administrative level falls within the broad definition of the practice of law, yet still authorize lay representatives to perform certain functions in the administrative setting when the public interest so demands.

{¶ 70} Because of the undeniable similarities in the unemployment compensation and workers' compensation settings, and considering that mandating the use of attorneys at the administrative level would frustrate the goals and designs of the workers' compensation system, we hold that nonlawyers who appear and practice in a representative capacity before the Industrial Commission and the Bureau of Workers' Compensation in conformity to Industrial Commission Resolution No. R04–1–01 are not engaged in the unauthorized practice of law.[2]

{¶ 71} Accordingly, the board's recommendation is hereby rejected, and the cause is remanded to the board with instructions to consider any allegations by relator that the respondents failed to act in accordance with standards now set forth in Resolution No. R04–1–01.

Judgment accordingly.

MOYER, C.J., LUNDBERG STRATTON and O'CONNOR, JJ., concur.

---

2. In light of this holding, we find relator's objections to the board's findings that respondents Wagner and Bossart did not engage in the unauthorized practice of law to be moot.

O'DONNELL, J., concurs in judgment only.

F.E. SWEENEY, J., dissents.

PFEIFER, J., dissents with opinion.

---

**PFEIFER, J., dissenting.**

{¶ 72} The Board of Commissioners on the Unauthorized Practice of Law concluded that CompManagement's "representation of employers' interests in handling claims before the Industrial Commission on behalf of employers amounts to the unauthorized practice of law." The board concluded that Comp-Management's "negotiation and involvement with settling claims before the Industrial Commission on behalf of employers amounts to the unauthorized practice of law." The board concluded that CompManagement's "direct and indirect examination of witnesses during hearings before the Industrial Commission amounts to the unauthorized practice of law." The board concluded that CompManagement's "presentation of employer concerns, arguments, summations of evidence, conclusions regarding the import of factual information and/or closing statements on behalf of employers during hearings before the Industrial Commission amounts to the unauthorized practice of law." The board concluded that CompManagement's "recommendation and advice to employers as to taking appeals or other legal action in handling claims before the Industrial Commission on behalf of employers amounts to the authorized practice of law." Finally, the board concluded that CompManagement's "evaluation, advice or recommendation concerning whether an employer should retain an attorney to handle a claim before the Industrial Commission amounts to the unauthorized practice of law." Based on the facts presented, I agree with each of these conclusions.

{¶ 73} I believe that the practice of law is the practice of law and that nonlawyers should not be authorized to engage in it. I believe this notwithstanding tradition and putative cost-savings. Finding that CompManagement and similar entities engaged in the unauthorized practice of law and prohibiting them from so engaging in the future would not lead to calamitous results. CompManagement could still play a meaningful role in a host of administrative activities. The market is overflowing with young, enterprising attorneys willing to perform this work. The surfeit of attorneys would help keep costs about where they are now. In any event, I do not find cost-savings to be a relevant issue. CompManagement engaged in the unauthorized practice of law and ought to be punished accordingly. I dissent.

Willacy, LoPresti & Marcovy and Aubrey B. Willacy; Michael P. Harvey Co., L.P.A., and Michael P. Harvey, for relator.

Baker & Hostetler, L.L.P., Robert M. Kincaid Jr., Elizabeth A. McNellie and Rodger L. Eckelberry, for respondents CompManagement, Inc., Robert J. Bossart, and Jonathan Wagner.

Hanna, Campbell & Powell, L.L.P., Douglas N. Godshall, Timothy C. Campbell and John R. Chlysta, for respondent Bobbijo Christensen.

Eugene P. Whetzel, in support of relator, for amicus curiae Ohio State Bar Association.

Downs, Hurst & Fishel, Marc A. Fishel and David A. Riepenhoff, in support of respondents, for amici curiae County Commissioners Association of Ohio, Ohio School Boards Association, and Ohio Public Employer Labor Relations Association.

Michael H. Cochran, in support of respondents, for amicus curiae Ohio Townships Association.

Vorys, Sater, Seymour & Pease, L.L.P., and Jonathan R. Vaughn, in support of respondents, for amicus curiae Ohio Library Council.

Philip J. Fulton Law Office and Philip J. Fulton, in support of respondents, for amicus curiae Ohio Academy of Trial Lawyers.

Squire, Sanders & Dempsey, L.L.P., Steven M. Loewengart and Greta M. Kearns, in support of respondents, for amicus curiae Council of Smaller Enterprises.

Schottenstein, Zox & Dunn and Kevin R. McDermott, in support of respondents, for amicus curiae the Service Association of Ohio, Inc.

Vorys, Sater, Seymour & Pease, L.L.P., Robert A. Minor and Robin Obetz, in support of respondents, for amici curiae Ohio Council of Retail Merchants and Ohio Self–Insurers Association.

Garvin & Hickey, L.L.C., Preston J. Garvin and Michael J. Hickey, in support of respondents, for amicus curiae Ohio Chamber of Commerce.

Bricker & Eckler, L.L.P., and Thomas R. Sant, in support of respondents, for amici curiae Ohio Chapter of the National Federation of Independent Business, Ohio Farm Bureau Federation, and Ohio Manufacturers' Association.

Zeiger, Tigges, Little & Lindsmith, L.L.P., John W. Zeiger, Steven W. Tigges and Stuart G. Parsell, in support of respondents, for amici curiae Greater Akron Chamber of Commerce, Canton Regional Chamber of Commerce, Greater Cincinnati Chamber of Commerce, city of Cincinnati, Greater Columbus Chamber of Commerce, Dayton Area Chamber of Commerce, Lake County Chambers of Commerce, Springfield & Clark County Chamber of Commerce; Ohio Grocers

Association, American Electric Power Service Corporation, the Ohio College Association, Inc., Ohio Newspaper Association, Ohio Association of Broadcasters, Ohio Automobile Dealers Association, Ohio Home Builders Association, Columbus Medical Association, Ohio Health Care Association, Ohio Dental Association, Ohio Restaurant Association, Ohio Wholesale Marketers Association, North Eastern Storeowners, Inc., Dayton Tooling and Manufacturing Association, Inc., American Council of Engineering Companies of Ohio, Ohio–Michigan Equipment Dealers Association, Ohio Association of McDonald's Operators, Ohio Ready Mixed Concrete Association, Ohio Lawn Care Association, Ohio Turfgrass Foundation, Ohio Pest Control Association, Ohio Association of Health Underwriters, the East Central Ohio Food Dealers Association, Community Bankers Association of Ohio, Alvan Motor Freight, Inc., American Rental Association of Ohio, Automotive Service Association of Ohio, Inc., Ohio Savings Bank, Ohio Forestry Association, Inc., Professional Insurance Agents Association of Ohio, Inc., Associated General Contractors of Ohio, Bowling Centers Association of Ohio, the Employers' Association, R.T. Lambert & Associates for Ohio Auto & Truck Recyclers, Ohio Council of Retail Merchants, the Wholesale Beer & Wine Association of Ohio, Allied Construction Industries, National Retail Hardware Association, Ohio Automatic Merchandising Association, Ohio Optometric Association, the E.W. Scripps Company, Ohio Association of Convenience Stores, Ohio Bakers Association, Great Lakes Petroleum Retailers & Allied Trade Association, Ohio Trucking Association, Ohio Veterinary Medical Association, Shepherd of the Valley Lutheran Retirement Services, Inc., Ohio Pork Producers Council, Ohio Association of Plumbing–Heating–Cooling Contractors, Inc., Subcontractors Association of Northeast Ohio, North American Employers' Council, Inc., Builders Exchange of East Central Ohio, the Ohio Nursery & Landscape Association, National Employers Network Alliance, Ohio Land Title Association, Ohio Florists' Association, Associated Builders & Contractors, Ohio Valley Chapter, National Electrical Contractors Association, Greater Cleveland Chapter, Air Conditioning Contractors of America, Ohio Chapter, and Ohio Tire Dealers and Retreaders Association.

Stewart Jaffy & Assoc. Co., L.P.A., Stewart R. Jaffy and Marc J. Jaffy, in support of respondents, for amicus curiae Ohio AFL–CIO.

Wiles, Boyle, Burkholder & Bringardner Co., L.P.A., Michael L. Close and Dale D. Cook, in support of respondents, for amicus curiae American International Companies.

Jim Petro, Attorney General, and Christopher D. Stock, Deputy Attorney General, for amicus curiae state of Ohio.

William E. Kovacic, Maureen K. Ohlhausen, James C. Cooper, and Brenda W. Doubrava, for amicus curiae Federal Trade Commission.