[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Deters*, Slip Opinion No. 2021-Ohio-2706.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-2706

DISCIPLINARY COUNSEL *v.* DETERS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Deters*, Slip Opinion No. 2021-Ohio-2706.]

*Unauthorized practice of law—Permanent injunction issued and civil penalty imposed.*

(No. 2020-1497—Submitted March 3, 2021—Decided August 10, 2021.)

ON FINAL REPORT by the Board on the Unauthorized Practice of Law

of the Supreme Court, No. UPL 19-03.

_____

**Per Curiam.**

{¶ 1} Respondent, Eric C. Deters, of Independence, Kentucky, was admitted to the Ohio bar in 1987 and permanently retired from the practice of law in Ohio on September 17, 2014, following the suspension of his Kentucky law license.  Following Deters's Ohio retirement, he transferred ownership of his law

firm, Deters & Associates, P.S.C. ("Deters Law"), to his father and continued to work as the office manager and a client liaison for the firm.

{¶ 2} In an April 5, 2019 complaint, relator, Disciplinary Counsel, charged Deters with engaging in the unauthorized practice of law by giving legal advice to Clinton and Jillian Pangallo, who had retained Deters Law to represent them regarding an Ohio-based personal-injury claim.

{¶ 3} A three-member panel of the Board on the Unauthorized Practice of Law conducted a hearing during which it heard testimony from Deters and the Pangallos.  In an October 2020 report, the panel found that Deters had engaged in four instances of the unauthorized practice of law by giving the Pangallos legal advice about their case: three during a meeting in which he persuaded them not to terminate his firm's representation and one in a subsequent telephone call.

{¶ 4} The panel recommended that Deters be permanently enjoined from engaging in the unauthorized practice of law and that we impose a civil penalty of $6,500.  The board adopted the panel's findings and recommendation that Deters be enjoined from engaging in the unauthorized practice of law, but it recommended that the civil penalty be doubled to $13,000.

{¶ 5} For the reasons that follow, we find that Deters engaged in a single instance of the unauthorized practice of law by giving case-specific legal advice to clients of the law firm that employed him.  We therefore permanently enjoin him from engaging in further acts of the unauthorized practice of law and order him to pay a civil penalty of $6,500.

## Deters's Conduct

{¶ 6} On September 8, 2017, Clinton Pangallo was injured in an auto accident while driving his employer's car.  Recalling that years earlier he had heard Deters speak on a radio program and had liked his demeanor, Clinton called Deters Law to schedule a consultation.  On September 22, 2017, Clinton and his wife, Jillian, met with Chuck Holbrook, an investigator employed by the firm.

2

Clinton signed a contingent-fee contract, agreeing to pay the firm one-third of the gross recovery in his personal-injury case.

{¶ 7} In early October, Stephanie Collins, an attorney with Deters Law, informed the Pangallos that she would be handling their case. Collins left Deters Law the following month and informed the Pangallos that Dominick Romeo would be their attorney going forward. They later learned that Romeo was not licensed in Ohio.

{¶ 8} On January 28, 2018, Clinton emailed Romeo to terminate the firm's representation. Deters emailed Jillian several times that night and asked to meet with her and Clinton in an effort to persuade them to stay with the firm. In those emails, he stated, "I can make sure everything is not only done right. But over the top." He also claimed, "We have a whole gang on cases. Ky. Ohio. Lawyers. Staff. Records requesters. Paralegals. Me. I just want to grab file tomorrow. See what has been done. And talk. * * * If we have droppedball [sic] I swear. I'll tell you we have."

{¶ 9} The next day, the Pangallos met with Deters and Holbrook. No attorney was present. During Deters's panel hearing, the Pangallos and Deters offered differing accounts of what had transpired at the meeting.

{¶ 10} The Pangallos testified that they did not know that Deters was not licensed to practice law when they met him, that he never said that he was or was not an attorney, and that they therefore assumed he was an attorney.[1] Jillian stated that Deters referred to himself by his nickname, "The Bulldog,"—a moniker that he has long used on the radio and in social media—and told them that he would take care of things and get things done. In addition to discussing the value of their case, the Pangallos recalled, Deters advised them about the

---

1. The board found that Jillian knew that Deters was not a lawyer, at least not an Ohio lawyer, prior to the January 29 meeting, but the testimony it cites to support that finding shows only that Dominick Romeo had informed Jillian that Romeo was not licensed in Ohio and that the firm did not have an Ohio-licensed personal-injury attorney at that time.

"stacking" of insurance policies, the differences between Ohio and Kentucky law on that issue, and how those differences could affect their recovery. Both Jillian and Clinton testified that Deters advised them to file a claim against Clinton's employer because it had higher insurance limits—and that he called their refusal to do so "stupid."

{¶ 11} Deters admitted that he gave the Pangallos his opinion regarding the value of their case based on his experience as an attorney and that they discussed the possibility that Clinton might be entitled to an award equal to the tortfeasor's policy limits. He also admitted that they discussed the possibility of pursuing a recovery from Clinton's employer—though he denied giving the Pangallos any advice on that issue and claimed that the issue of stacking insurance policies "never came up" in their discussions.

{¶ 12} Deters also testified that after the Pangallos told him that they were experiencing financial difficulties, he offered to arrange a presettlement loan through Barrister Capital and told them how the loan would work. According to the Pangallos, Deters advised them that the repayment of the loan would be contingent on winning their case and that they would not have to pay much interest, because their case would be settled within one month. They testified—and Deters acknowledged—that they relied on that advice in deciding to accept the loan.

{¶ 13} By the time the meeting ended, Deters (purportedly with his father's approval) had agreed to reduce the Pangallos' contingent fee to 28 percent of their recovery and the Pangallos had agreed to allow Deters Law to continue representing them.

{¶ 14} After the meeting, the Pangallos obtained a $3,000 loan from Barrister Capital. Jillian and Deters exchanged several emails discussing Clinton's medical treatment and the efforts being made to determine the limits of

the tortfeasor's insurance policy. Deters opined that an insurer's refusal to state the limits of its policy "usually means high limits."

{¶ 15} On April 24, 2018, Jillian emailed a letter from Clinton to Deters terminating the firm's representation. In an emailed response, Deters asserted that he had not "handled" the Pangallos' case and identified three other lawyers who had purportedly worked on the case. However, Jillian testified that she had never heard of two of those attorneys and that the third attorney had told her that he was not working on her case. She also testified that shortly after she received that email, Deters called to tell her that she and Clinton would still owe the full contingent fee to Deters Law on top of any fee they paid to a new attorney— which she understood to mean that they would owe Deters Law the full contingent fee in addition to any fee they would owe their new attorney.

{¶ 16} As of January 2020, Clinton's case had not settled and the amount the Pangallos owed on their $3,000 loan had increased to more than $10,000.

**The Board Found that Deters Engaged in the Unauthorized Practice of Law**

{¶ 17} The board found that Deters engaged in four instances of the unauthorized practice of law by (1) giving the Pangallos his opinion regarding the value of their personal-injury case, (2) advising them about the practice of stacking insurance policies and recommending that they sue Clinton's employer, (3) giving them his analysis of how quickly their case would settle, and (4) advising them that Deters Law would exert a lien for the full contingent fee on their final settlement if they terminated the firm's representation.

**Deters's Objections to the Board's Findings**

{¶ 18} Deters objects to the board's findings that he engaged in the unauthorized practice of law by giving legal advice to the Pangallos. Although he has admitted that he made some of the statements that the board found to constitute the unauthorized practice of law, he characterizes his actions with regard to most of those statements as "passing on information" and steadfastly

maintains that he did not provide legal services or render legal advice to the Pangallos. In fact, he asserts that any staff member of a law firm could make the statements he made to the Pangallos without committing the unauthorized practice of law and that trial consultants, paralegals, and other law-firm staff engage in this type of conduct every day. For the reasons that follow, we find that Deters's objections are without merit.

### Deters Engaged in the Unauthorized Practice of Law

{¶ 19} This court has original jurisdiction over the admission to the practice of law in Ohio, the discipline of persons so admitted, and "all other matters relating to the practice of law," Article IV, Section 2(B)(1)(g), Ohio Constitution, which includes the regulation of the unauthorized practice of law, *Greenspan v. Third Fed. S. & L. Assn.*, 122 Ohio St.3d 455, 2009-Ohio-3508, 912 N.E.2d 567, ¶ 16. The purpose of that regulation is to "protect the public against incompetence, divided loyalties, and other attendant evils that are often associated with unskilled representation." *Cleveland Bar Assn. v. CompManagement, Inc.*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, ¶ 40.

{¶ 20} We have defined the unauthorized practice of law to include both the "[h]olding out to the public or otherwise representing oneself as authorized to practice law in Ohio" and the "rendering of legal services for another" by any person who is not authorized to practice law under our rules. Gov.Bar R. VII(2)(A)(1) and (4). We have held, "The practice of law is not restricted to appearances in court; it also encompasses giving legal advice and counsel." *Cincinnati Bar Assn. v. Telford*, 85 Ohio St.3d 111, 112, 707 N.E.2d 462 (1999), citing *Cleveland Bar Assn. v. Misch*, 82 Ohio St.3d 256, 259, 695 N.E.2d 244 (1998).

{¶ 21} One key element of the practice of law is the tailoring of legal advice to the needs of a specific person. *See, e.g.*, *Green v. Huntington Natl. Bank*, 4 Ohio St.2d 78, 80, 212 N.E.2d 585 (1965) (holding that giving specific

legal information in relation to the specific facts of a particular person's case for the purpose of obtaining a more beneficial condition "represent[s] the giving of legal advice"); *Disciplinary Counsel v. Palmer*, 115 Ohio Misc.2d 70, 74, 761 N.E.2d 716 (Bd.Unauth.Prac.2001) (dismissing an unauthorized-practice-of-law complaint filed against a layman who published general legal advice or opinions on a website, because there was insufficient evidence to establish that he gave legal advice customized to the particularized needs of any individual).

{¶ 22} In this case, relator has proved by a preponderance of the evidence that Deters offered the Pangallos legal advice and counsel tailored to the specific facts and circumstances of their case.

{¶ 23} First, Deters gave the Pangallos his own opinion of the value of their case and how long it would take to settle. Deters argues that stating the value of a case does not constitute legal advice, because trial consultants make a living by offering the same kinds of opinions. But, as the board noted, a trial consultant gives an opinion regarding the value of a case to a lawyer—not the client. The lawyer then takes that opinion, applies the lawyer's own knowledge and experience, and chooses which parts of the consultant's opinion—if any—to incorporate into the lawyer's own advice to the client.

{¶ 24} Deters did not convey his opinion to an attorney assigned to the Pangallos' case, nor did he relay the opinion of the Pangallos' attorney to them. Instead, he told them what *he thought* the case was worth based on his years of experience as a lawyer. At the time that he gave them that legal advice, it had been more than three years since he had been licensed to practice law in Ohio.

{¶ 25} Second, according to the Pangallos, Deters informed them that the practice of stacking insurance policies is permitted under Kentucky law but not under Ohio law. He also recommended that the Pangallos sue Clinton's employer in addition to suing the tortfeasor, in an effort to increase their potential recovery. Although Deters generally denied that he had said these things, the hearing panel

found that the Pangallos' testimony was more credible. We defer to that determination because the panel members saw and heard the witnesses firsthand and the record does not weigh heavily against it. *See, e.g.*, *Cuyahoga Cty. Bar Assn. v. Wise*, 108 Ohio St.3d 164, 2006-Ohio-550, 842 N.E.2d 35, ¶ 24.

{¶ 26} Third, Deters gave the Pangallos general information about how a presettlement loan works, assured them that their case would settle within one month considering the facts of the matter, and explained that a quick settlement would limit the amount of interest they would have to pay for the loan. Although giving a general explanation of how such a loan works does not amount to giving legal advice, Deters's providing the Pangallos with his analysis of the facts of their case, his assessment of the timeline for settlement, and his opinion regarding the anticipated length of the loan all constituted giving legal advice. And both of the Pangallos testified—and Deters admitted—that they relied on Deters's advice in deciding to accept the presettlement loan.

{¶ 27} Finally, when the Pangallos informed Deters that they were terminating his law firm's representation, Deters gave them the erroneous legal advice that the firm would still be entitled to its entire contracted fee.

{¶ 28} Although Deters asserts that paralegals and other law-firm employees engage in this type of conduct every day, his speculative argument—even if true—is not a valid defense to the charge of the unauthorized practice of law. Laymen may assist lawyers in preparing legal documents and managing pending client matters, but their activities must be carefully supervised and approved by a licensed practitioner. *Columbus Bar Assn. v. Thomas*, 109 Ohio St.3d 89, 2006-Ohio-1930, 846 N.E.2d 31, ¶ 14. "A paralegal who, without the supervision of an attorney, advises and represents a claimant in a personal injury matter is engaged in the unauthorized practice of law." *Columbus Bar Assn. v. Purnell*, 94 Ohio St.3d 126, 760 N.E.2d 817 (2002), citing *Cincinnati Bar Assn. v. Cromwell*, 82 Ohio St.3d 255, 695 N.E.2d 243 (1998).

**{¶ 29}** Deters suggested that four different attorneys worked on the Pangallos' case after Collins left the firm. However, the Pangallos had never heard of two of those attorneys and one had told Jillian that he was not working on the case. The fourth attorney, Romeo, was the only attorney who appears to have had any communication with the Pangallos following Collins's departure. But he was not licensed in Ohio. In short, there is no evidence that any Ohio-licensed attorney was assigned to the Pangallos' case after Collins left the firm. And the only evidence that there was *any* attorney supervision of Deters was (1) his own testimony that his father approved the reduction of the Pangallos' contingent fee and (2) the response he sent to Jillian—just two minutes after she emailed him to inquire about the availability of other insurance coverage for Clinton's accident—claiming, "Lawyers here confirmed. Only policy can seek liability coverage on is the car that hit you."

**{¶ 30}** Although Deters was not charged with engaging in the unauthorized practice of law by holding himself out as an attorney, it appears that that is exactly what he did. Though he never went so far as to affirmatively state that he was an attorney, he made no effort to clarify to the Pangallos his role in the firm or to inform them that he was no longer licensed to practice law in Ohio or any other jurisdiction. Instead, as a representative of a firm that bore his surname, he met with the Pangallos outside the presence of any attorney, referred to himself as "The Bulldog," and urged them to have confidence in him personally, even though he was not licensed to represent them. Furthermore, he gave them legal advice based on his own legal knowledge and years of experience that was tailored to the facts of their particular case. Simply stated, his actions were not those of a paralegal conveying general information or relaying case-specific information under the supervision of an attorney—they were the actions of a nonlawyer engaging in the practice of law.

{¶ 31} On these facts, we overrule Deters's objections and accept the board's findings that Deters engaged in the unauthorized practice of law by giving legal advice to the Pangallos. Because we find that that legal advice was, for the most part, given in a single conversation, we find that it constitutes a single instance of the unauthorized practice of law.

## An Injunction and Civil Penalty Are Warranted

{¶ 32} Having found that Deters engaged in the unauthorized practice of law, the board recommends that we permanently enjoin him from engaging in further acts of the unauthorized practice of law in Ohio.

{¶ 33} The panel recommended that we impose a civil penalty of $6,500 for the four instances of the unauthorized practice of law that it found ($1,500 for each of the first three violations and $2,000 for his final violation), but the board recommends that that penalty be doubled to $13,000.

{¶ 34} In determining the appropriate sanction, Gov.Bar R. VII(8)(B) instructs us to consider (1) the degree of the respondent's cooperation during the investigation, (2) the number of times the respondent engaged in the unauthorized practice of law, (3) the flagrancy of the respondent's violations, (4) any harm that the violations caused to third parties, and (5) any other relevant factors, which may include the aggravating and mitigating circumstances identified in UPL Reg. 400(F). *See also Disciplinary Counsel v. Ward*, 155 Ohio St.3d 488, 2018-Ohio-5083, 122 N.E.3d 168, ¶ 13.

{¶ 35} Deters fully cooperated with relator's investigation, though the board noted that his cooperation declined somewhat after relator filed his complaint. And although the board found four instances of the unauthorized practice of law, we have found that Deters engaged in a single offense. While that offense was flagrant, it does not appear that the Pangallos have suffered any lasting harm as a result of Deters's misconduct. Indeed, there is no evidence that

Deters delayed their case or that they had any alternative but to accept the recommended loan to alleviate their acute financial distress.

{¶ 36} Ultimately, we are most troubled by Deters's struggle to accept his diminished role in the legal profession following his Kentucky suspension and his Ohio retirement. That struggle was evident at the panel hearing when he testified, "You know, I'm a litigator," nearly six years after he was last licensed to practice law in any jurisdiction. We believe that the imposition of an injunction and a $6,500 civil penalty will serve as an appropriate deterrent to future acts of the unauthorized practice of law.

**Conclusion**

{¶ 37} Accordingly, we permanently enjoin Eric C. Deters from engaging in acts constituting the unauthorized practice of law in Ohio. We also order Deters to pay a civil penalty of $6,500 for his single offense of the unauthorized practice of law. Costs are taxed to Deters.

Judgment accordingly.

DEWINE, DONNELLY, and STEWART, JJ., concur.

O'CONNOR, C.J., concurs, with an opinion joined by FISCHER, J. (except that he would impose a $13,000 penalty) and BRUNNER, J.

KENNEDY, J., concurs in judgment only, with an opinion.

––––––––––––––––––

**O'CONNOR, C.J., concurring.**

{¶ 38} I fully concur in the majority's reasoning and judgment, but I write separately to respond to the suggestion in the concurring-in-judgment-only opinion that we should apply an unnecessary "professional-judgment" standard when determining whether a nonlawyer has engaged in the unauthorized practice of law. Adopting the standard proposed by the concurring-in-judgment-only opinion would not provide clarity in this area of the law and would be potentially harmful.

{¶ 39} The concurring-in-judgment-only opinion cites a litany of foreign cases and law-review articles for the uncontroversial proclamation that there is no universally accepted definition of "practice of law." Indeed, rather than attempting the impossible—enunciating an inclusive list of activities that constitute the practice of law—we have broadly defined the "unauthorized practice of law" by rule as the "rendering of legal services for another by any person not admitted to practice [law] in Ohio." Gov.Bar R. VII(2)(A)(1). The practice of law includes providing legal advice and counsel to clients. *Land Title Abstract & Trust Co. v. Dworken*, 129 Ohio St.23, 28, 193 N.E. 650 (1934). And as the majority opinion notes, we have recognized that a key element of practicing law is tailoring that advice to the needs of a specific person. Majority opinion at ¶ 21, citing *Green v. Huntington Natl. Bank*, 4 Ohio St.2d 78, 80, 212 N.E.2d 585 (1965). The concurring-in-judgment-only opinion, however, suggests that more is needed.

{¶ 40} The concurring-in-judgment-only opinion feigns concern that this court will overstep its bounds and find the unauthorized practice of law anytime a nonlawyer shares general legal knowledge that the person has acquired while going through life. Under that guise, it suggests that this court clarify for the public and the bar that a layperson who gives tailored legal advice to another engages in the unauthorized practice of law only when the layperson "exercise[s] professional judgment" in doing so. Opinion concurring in judgment only at ¶ 47. Not only does the concurring-in-judgment-only opinion's description of the proposed professional-judgment standard fail to clarify the contours of the practice of law, but its attempt to clarify the meaning of "practice of law" is wholly unwarranted in this case, because this case involves conduct that the members of this court unanimously agree constitutes the unauthorized practice of law.

**{¶ 41}** This court has exclusive jurisdiction to regulate the unauthorized practice of law, *Toledo Bar Assn. v. VanLandingham*, 143 Ohio St.3d 328, 2015-Ohio-1622, 37 N.E.3d 1195, ¶ 5, and we undertake that task in a common-sense manner for the purpose of protecting the public, *Henize v. Giles*, 22 Ohio St.3d 213, 218, 490 N.E.2d 585 (1986), citing *Cowern v. Nelson*, 207 Minn. 642, 647, 290 N.W. 795 (1940). Common sense demands consideration of context when determining whether particular conduct constitutes the practice of law. *See Henize* at 219 (allowing lay representation in the "limited setting" of an administrative hearing before the Unemployment Compensation Board of Review).

**{¶ 42}** The relevant context here includes Deters's background (his education and legal experience) and the circumstances under which he gave advice to Clinton and Jillian Pangallo (as a representative of Deters & Associates, P.S.C. while it was engaged to provide legal representation to the Pangallos). Although Deters is not licensed to practice law in Ohio, he is not a "layperson," as that word is commonly understood. *See* https://dictionary.cambridge.org/us/dictionary/english/layperson (accessed July 13, 2021) [https://perma.cc/C9KD-VDSB] (defining "layperson" as "someone who is not an expert in or does not have a detailed knowledge of a particular subject"). It cannot be said that Deters lacks detailed knowledge of the law. He successfully completed the formal legal education required to obtain admission to the bar, and he practiced law in Ohio for more than 25 years before resigning his license. Resignation of his Ohio law license and suspension of his Kentucky law license surely did not eradicate his legal acumen.

**{¶ 43}** Also part of the relevant context here is that Deters continues to work for the law firm that bears his surname, purportedly as office manager and client liaison. In that capacity, Deters met with the Pangallos and discussed their legal needs outside the presence of a licensed lawyer. When the Pangallos

attempted to terminate their relationship with the law firm, it was Deters—not one of the licensed attorneys who were supposedly responsible for their case—who responded and, at least initially, persuaded them to remain clients of the firm. His advice to the Pangallos—including his opinions on whom they should sue, the value of their case, how long it would take to settle their case, and the viability of stacking insurance policies in Kentucky and Ohio—was given in the context of the firm's legal representation of the Pangallos, was based on Deters's own legal experience, and was tailored to the Pangallos' legal needs. When Deters's conduct is viewed in this context, it is clear that this is not a case about a layperson who has innocently shared passively acquired knowledge of the law— the type of conduct the concurring-in-judgment-only opinion purportedly seeks to safeguard.

{¶ 44} Moreover, adoption of a professional-judgment standard would afford no more clarity with respect to the bounds of the practice of law than our existing precedent, which holds that a person engages in the practice of law when the person provides legal advice that is specifically tailored to another person's particular needs, *Green*, 4 Ohio St.2d at 80, 212 N.E.2d 585. In most cases, giving such legal advice will satisfy the concurring-in-judgment-only opinion's proposed requirement that to engage in the unauthorized practice of law, a nonlawyer must determine the issues and apply to them the nonlawyer's knowledge of the law. And the concurring-in-judgment-only opinion cites no example of this court's finding the unauthorized practice of law based on a nonlawyer's merely providing "general legal information and advice," opinion concurring in judgment only at ¶ 58. In fact, the Board of Commissioners on the Unauthorized Practice of Law has dismissed complaints alleging violations for such conduct. *See Disciplinary Counsel v. Palmer*, 115 Ohio Misc.2d 70, 74, 761 N.E.2d 716 (Bd.Unauth.Prac.2001) ("publication of general legal advice * * * is not of itself the unauthorized practice of law").

{¶ 45} Not only is the concurring-in-judgment-only opinion's proposed professional-judgment standard unclear, but, if this court were to adopt the standard as it is described in that opinion, we would unjustifiably limit the pool of people subject to censure for the unauthorized practice of law. The opinion states that "exercising professional judgment ' "require[s] more than the most elementary knowledge of the law, or more than that which [a layperson] may be deemed to possess." ' " (Brackets added in opinion concurring in judgment only.) Opinion concurring in judgment only at ¶ 52, quoting *Lukas v. Montgomery Cty. Bar Assn.*, 35 Md. App. 442. 448, 371 A.2d 669 (1977), quoting Annotation, *What Amounts to Practice of Law*, 111 A.L.R. 19, 24-25 (1937). Were we to adopt that standard, at what point would a nonlawyer's knowledge of the law tip the scale such that he or she would be deemed to possess enough legal knowledge to be able to exercise professional judgment and thus able to engage in the unauthorized practice of law? The proposed standard would insulate people from the prohibition on the unauthorized practice of law simply because they lack a sufficient but undefined quantum of legal training. Deters had a formal legal education and decades of experience as a practicing lawyer before he surrendered his license, but those requirements cannot be prerequisites to engaging in the unauthorized practice of law if we are to fulfill our objective of "protect[ing] the public against incompetence, divided loyalties, and other attendant evils that are often associated with unskilled representation," *Cleveland Bar Assn. v. CompManagement, Inc.*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, ¶ 40.

{¶ 46} Despite its stated goal of providing additional guidance to the public and the bar, the concurring-in-judgment-only opinion does not clarify the bounds of the practice of law, and its proposed standard would limit the pool of people subject to censure for the unauthorized practice of law. I cannot agree that

such a limitation is in the public interest. For these reasons, I fully concur in the majority opinion.

FISCHER, J., concurs in the foregoing opinion except that he would impose a $13,000 penalty.

BRUNNER, J., concurs in the foregoing opinion.

_____

**KENNEDY, J., concurring in judgment only.**

{¶ 47} I concur in the judgment of the majority but write separately to assert that the focus of our inquiry in matters in which a layperson, that is, a person who lacks a valid Ohio law license, is charged with engaging in the unauthorized practice of law by providing legal advice to others should be on whether the person exercised professional judgment in giving the legal advice. Most people acquire some legal knowledge throughout their lives, but in general, they are not engaging in the unauthorized practice of law if they share this information with others. Rather, it should be only if the layperson has exercised professional judgment about a specific legal issue that they should be found to have engaged in the unauthorized practice of law. When respondent Eric Deters's behavior is viewed through this lens, he engaged in the unauthorized practice of law when he gave Jillian and Clinton Pangallo advice about their legal issues that drew upon his professional knowledge and judgment.

{¶ 48} There is no universally accepted definition of "the practice of law." Buhai, *Act Like a Lawyer, Be Judged Like a Lawyer: the Standard of Care for the Unlicensed Practice of Law*, 2007 Utah L.Rev. 87, 94. And formulating a comprehensive definition has proved to be elusive. *See In re Opinion No. 26 of Commt. on the Unauthorized Practice of Law*, 139 N.J. 323, 341, 654 A.2d 1344 (1995), quoting *Auerbacher v. Wood*, 142 N.J.Eq. 484, 485, 59 A.2d 863 (E.&A.1948) (" 'What constitutes the practice of law does not lend itself to precise and all inclusive definition' "); *Utah State Bar v. Summerhayes &*

16

*Hayden, Pub. Adjusters*, 905 P.2d 867, 869 (Utah 1995) (noting that it is "difficult to define precisely" the practice of law); *State ex rel. Frieson v. Isner*, 168 W.Va. 758, 767, 285 S.E.2d 641 (1981), fn. 2 ("Arriving at a concise definition of what constitutes the practice of law has proven difficult for most courts"); *Washington State Bar Assn. v. Great W. Union Fed. S. & L. Assn.*, 91 Wash.2d 48, 54, 586 P.2d 870 (1978) ("The 'practice of law' does not lend itself easily to precise definition"); Michigan *State Bar v. Cramer*, 399 Mich. 116, 133, 249 N.W.2d 1 (1976), quoting *Grand Rapids Bar Assn. v. Denkema*, 290 Mich. 56, 64, 287 N.W. 377 (1939) ("any attempt to formulate a lasting, all encompassing definition of 'practice of law' is doomed to failure 'for the reason that under our system of jurisprudence such practice must necessarily change with the everchanging business and social order' "); *Denver Bar Assn. v. Pub. Util. Comm.*, 154 Colo. 273, 279, 391 P.2d 467 (1964) ("There is no wholly satisfactory definition as to what constitutes the practice of law").

{¶ 49} The reason it is so difficult to formulate a universal definition for "the practice of law" is that " '[l]aw permeates so many aspects of [our] personal lives and commercial affairs that * * * most individuals, whether or not they are lawyers, are knowingly or unknowingly encountering and interpreting laws on a daily basis * * *.' " (Brackets and ellipses sic.) Zurek, *The Limited Power of the Bar to Protect Its Monopoly*, 3 St. Mary's J. Legal Mal. & Ethics 242, 248-249 (2013), quoting Luppino, *Multidisciplinary Business Planning Firms: Expanding the Regulatory Tent Without Creating a Circus*, 35 Seton Hall L.Rev. 109, 131 (2004). As stated by one of our sister supreme courts:

> The practice of law is not subject to precise definition. It is not confined to litigation but often encompasses "legal activities in many non-litigious fields which entail specialized knowledge and ability." Therefore, the line between permissible business and

professional activities and the unauthorized practice of law is often blurred.

*In re Opinion No. 24 of Commt. on Unauthorized Practice of Law*, 128 N.J. 114, 122, 607 A.2d 962 (1992), quoting *In re Application of the New Jersey Soc. of Certified Pub. Accountants*, 102 N.J. 231, 236, 507 A.2d 711 (1986).

{¶ 50} We have fared no better. This court has never provided an all-inclusive definition for "the practice of law." Rather, we have enunciated broad, general statements as to what constitutes the practice of law, such as, "all advice to clients and all action taken for them in matters connected with the law," *Land Title Abstract & Trust Co. v. Dworken*, 129 Ohio St. 23, 193 N.E. 650 (1934), paragraph one of the syllabus, and "the practice of law is not limited to appearances in court, but also includes giving legal advice and counsel," *Cleveland Bar Assn. v. Misch*, 82 Ohio St.3d 256, 259, 695 N.E.2d 244 (1998). And our definition of what constitutes the unauthorized practice of law is just as broad. Gov.Bar R. VII(2)(A)(1) states that, with six noted exceptions, the unauthorized practice of law is the "rendering of legal service for another by any person not admitted to practice in Ohio."

{¶ 51} In this matter, the majority finds that Deters crossed the line into the unauthorized practice when he gave legal advice that was tailored to the needs of the Pangallos. But is this truly when the line was crossed? As the Pennsylvania Supreme Court has recognized, there are times when laypersons have the knowledge "to appreciate the legal problems and consequences involved in a given situation and the factors which should influence necessary decisions." *Dauphin Cty. Bar Assn. v. Mazzacaro*, 465 Pa. 545, 553, 351 A.2d 229 (1976). And in those situations, the advice given by the layperson is not of such a nature so as to violate the policies supporting regulation of the unauthorized practice of law. *See id.* ("No public interest would be advanced by requiring these lay

judgments to be made exclusively by lawyers"). And the giving of advice in those situations is not seen as the practice of law, because in those situations, it is recognized that the relationship between the person giving the advice and the person receiving the advice "is not based on the reasonable expectation that learned and authorized professional legal advice is being given," Commentary to D.C. Ct. App.R. 49(b)(2) (the rule defining "practice of law"). In other words, the layperson did not exercise professional judgment.

{¶ 52} "[P]rofessional judgment lies at the core of the practice of law." *Iowa State Bar Assn. Commt. on Professional Ethics & Conduct v. Baker*, 492 N.W.2d 695, 701 (Iowa 1992). And exercising professional judgment " 'require[s] more than the most elementary knowledge of the law, or more than that which [a layperson] may be deemed to possess,' " *Lukas v. Montgomery Cty. Bar Assn.*, 35 Md.App. 442, 448, 371 A.2d 669 (1977), quoting Annotation, *What Amounts to Practice of Law*, 111 A.L.R. 19, 24-25 (1937). Moreover, exercising professional judgment is an art that requires "lawyers [to] determine what the issues are and use their knowledge of the law to solve them in an ethical way." *Baker* at 701. Professional judgment is called for when an opinion is given that "requires the abstract understanding of legal principles and a refined skill for their concrete application." *Dauphin* at 553. Laypersons, in contrast, use their legal knowledge "for informational purposes alone." *Baker* at 701. Permitting only lawyers to act in matters requiring professional judgment best serves the public interest, *Bergantzel v. Mlynarik*, 619 N.W.2d 309, 312-313 (Iowa 2000), whereas permitting only lawyers to express lay judgments would not advance a public interest, *Dauphin* at 553.

{¶ 53} Therefore, we should not end our inquiry with whether the layperson tailored legal advice to the needs of a specific person. Rather, we should ask whether in doing so the layperson exercised professional judgment.

**{¶ 54}** Using the issue Deters confronted in this case as an example, a layperson with an elementary knowledge of the law could have advised the Pangallos that they had a personal-injury claim against the driver of the automobile who rear-ended Clint and should pursue legal action. In offering that advice, the layperson would have provided legal advice tailored to the needs of the Pangallos. And it is likely that these types of conversations happen all over the country on a daily basis. But in imparting this advice, the layperson has not exercised professional judgment and therefore has not engaged in the practice of law. Unlike Deters, the layperson in the example did not give advice as to the types of claims the Pangallos could assert: personal injury, property damage, lost wages, and loss of consortium; the layperson did not provide a monetary figure for what the claims were worth; and the layperson did not discuss other potential insurance policies that may provide coverage and the manner in which different jurisdictions may handle multiple-insurance-policy coverage. Providing advice on those topics requires "the abstract understanding of legal principles and a refined skill for their concrete application," *Dauphin,* 465 Pa. at 553, 351 A.2d 229.

**{¶ 55}** Deters argues that his advising the Pangallos was no different from what paralegals and legal staff in law offices do every day across Ohio and the country. Deters is wrong. He was not providing legal advice at the direction of an attorney, which is what paralegals are permitted to do. *See Columbus Bar Assn. v. Purnell*, 94 Ohio St.3d 126, 760 N.E.2d 817 (2002) ("A paralegal who, without the supervision of an attorney, advises and represents a claimant in a personal injury matter is engaged in the unauthorized practice of law").

**{¶ 56}** Instead, he drew on *his* legal knowledge and judgment from his years as an attorney and provided *his* legal advice to the Pangallos about their case. Deters met with the Pangallos, learned the facts of their case, drew on his knowledge of the law, determined what issues the Pangallos faced in pursuing

20

their claims, and provided solutions for them. He not only informed them of the ability to pursue a claim against Clinton's employer, as Clinton was driving a company car, but also explained the rationale for pursuing such a claim—higher insurance limits. He also explained the legal concept of stacking insurance policies and how Ohio and Kentucky law differed. Deters's legal knowledge was neither elementary nor used for informational purposes alone. Rather, he was exercising professional judgment when he tailored the legal advice to the legal needs of the Pangallos.

{¶ 57} Deters also utilized his professional judgment when he provided a valuation of the Pangallos' claims that was based on his former experiences as a lawyer. To value the claim, Deters needed to determine the legal liability involved, the legal rights of the Pangallos, and what damages were legally compensable. *See Green v. Unauthorized Practice of Law Commt.*, 883 S.W.2d 293, 298 (Tex.App.1994) (layperson engaged in the unauthorized practice of law by determining clients' legally compensable damages). This advice was also not elementary or informational. Deters drew on his years of experience as a practicing lawyer to provide solutions for legal questions that required the application of a trained legal mind.

{¶ 58} While "the amorphous nature of the practice of law * * * makes inquiries into unauthorized practice principles * * * challenging," Lanctot, *Scriveners in Cyberspace: Online Document Preparation and the Unauthorized Practice of Law*, 30 Hofstra L.Rev. 811 (2002), we must strive to provide as much guidance as possible to the bar and the public. By providing guidance, we will not only advance the purpose of protecting the public from the unauthorized practice of law, *Cleveland Bar Assn. v. CompManagement, Inc.*, 104 Ohio St.3d 168, 2004-Ohio-6506, 818 N.E.2d 1181, ¶ 40, but also "facilitat[e] consumer choice and enhanc[e] access to justice." Rhode & Ricca, *Protecting the Profession or the Public? Rethinking Unauthorized-Practice Enforcement*, 82

Fordham L.Rev. 2587, 2608 (2014). And by narrowing our focus in cases in which a layperson has provided legal advice to determining whether the layperson exercised professional judgment or merely provided general legal information and advice, we will provide greater direction to the bar and public.

Therefore, I concur in judgment only.

_____

Joseph M. Caligiuri, Disciplinary Counsel, for relator.

Eric C. Deters, pro se.

_____